# UNITED STATES DISTRICT COURT

## WESTERN DISTRICT OF LOUISIANA

## LAFAYETTE-OPELOUSAS DIVISION

| | | |
|---|---|---|
| **WESLEY MEAUX** | * | **CIVIL ACTION NO. 05-1155** |
| **VERSUS** | * | **JUDGE MELANÇON** |
| **COMMISSIONER OF SOCIAL SECURITY** | * | **MAGISTRATE JUDGE HILL** |

## REPORT AND RECOMMENDATION

This social security appeal was referred to me for review, Report and Recommendation pursuant to this Court's Standing Order of July 8, 1993. Wesley Meaux, born November 16, 1963, filed an application for a period of disability, disability insurance benefits, and supplemental security income on February 28, 2002, alleging disability as of December 7, 2001, due to a back injury, neck pain, leg weakness, hand and foot numbness, headaches, muscle spasms, and falling down.

## FINDINGS AND CONCLUSIONS

After a review of the entire administrative record and the briefs filed by the parties, and pursuant to 42 U.S.C. § 405(g), I find that there is not substantial evidence in the record to support the Commissioner's finding that the claimant was not disabled and that this case should be remanded for further proceedings.

In fulfillment of F.R.Civ.P. 52, I find that this case should be remanded for further proceedings, based on the following:

**(1) Residual Functional Capacity Assessment dated July 23, 2002**. The state agency examiner determined that claimant could lift/carry 20 pounds occasionally and 10 pounds frequently. (Tr. 113). He could stand/walk and sit about 6 hours in an 8-hour workday. He had unlimited push/pull ability. He could perform all postural activities occasionally. (Tr. 114). The examiner noted that with the lack of physical findings, claimant's history was only partially credible. (Tr. 117).

**(2) Records from American Legion Hospital dated November 14, 2001**. An MRI of the lumbar spine showed a minimal disc bulge with slight disc dessication at the L4-L5 level. (Tr. 122).

**(3) Records from Southwest Medical Center dated September 10, 2000 to December 10, 2001**. On September 12, 2000, claimant presented with chest pain. (Tr. 125). Left heart catheterization revealed normal coronaries with no disease. The assessment was chest pain syndrome with normal catheterization, a positive smoker, and questionable gastroesophageal reflux disease. (Tr. 126).

Lumbar spine x-rays dated December 10, 2001, showed minimal early degenerative changes with no acute osseous pathology. (Tr. 124).

**(4) Records from Dr. Doreen Abadco dated June 6, 2001 to February 14, 2002**.  On June 6, 2001, claimant was seen for multiple cervical radiculpathy with severe myofacial pain syndrome on the mid-back.  (Tr. 138).  His pain score was 8/10 on VAS, and he reported only 30 to 35% relief with Lortab and Baclofen.  On examination, his back had severe myofacial spasms and multiple trigger points.  The diagnoses were cervical radiculopathy and myofascial pain syndrome of the mid-back.  Dr. Abadco prescribed a trigger point injection, Zanaflex, and Wellbutrin to help claimant stop smoking.  (Tr. 138-39).

A current perception threshold test dated August 8, 2001, showed mild radiculopathy on the left side of L1 and severe radiculopathy at S1 on the right.  (Tr. 133, 135).  Claimant's pain score was 6/10, with about 75% pain relief overall.  (Tr. 133).  He complained that his left leg had been giving out.  Dr. Abadco noted that he had a history of hepatitis.  She prescribed Oxycontin and ordered an MRI and liver function test.  (Tr. 134).

On January 9, 2002, claimant complained of lower back pain going down to his right side after slipping and falling at work.  (Tr. 131).  He had to stop working because of the pain.  Spinal examination revealed limited movements, and swelling with tenderness on the midline at L3-L5.  Dr. Abadco's assessment was a flare up of low back pain secondary to the fall and cervical radiculopathy.  (Tr. 132).

On February 14, 2002, claimant's pain score was 9/10, with 10% pain relief. (Tr. 129). He reported feeling very depressed because of the uncertainty with his pain and financial situation. Straight leg testing revealed significant low back pain and tightness at 40 degrees. Dr. Abadco's assessment was exacerbation of lumbar radiculopathy, lumbar disc disease, cervical radiculopathy, severe myofascial pain syndrome, depression and increased anxiety secondary to chronic pain disorder. She increased his Oxycontin and scheduled him for a steroid injection.

**(5) Consultative Orthopedic Examination by Dr. Michael Leddy, III, dated June 1, 2002**. Claimant presented with back and neck pain and occasional headaches. (Tr. 143). He complained that epidural steroid injections and physical therapy had not helped. He reported that he could sit and stand for only 15 to 20 minutes at a time, and could dress only in pull over clothes because he had difficulty putting on belts and such. He said that he did not drive. He stated that he was able to climb stairs with a rail.

Additionally, claimant complained that he was having problems controlling his bladder, and had sometimes urinated on himself. He also reported smoking one pack of cigarettes per day.

On examination, claimant was 67 inches tall and weighed 315 pounds. His blood pressure was 135/87. He was alert and had a very flat affect. He ambulated

with a moderate left-sided limp, but was able to get on and off of the examining table and up and out of the chair with no significant difficulties.

Lumbar spine flexion was to 50 degrees with significant pain to the lower extremities. (Tr. 144). Straight leg raising was positive on the left in the supine position and negative bilaterally in the sitting position. He was able to do a heel raise and heel to toe walk, but had difficulty doing a toe raise on the left side.

The upper extremities showed 2+ radial pulses with no signs of edema, cyanosis, clubbing, or swelling. Grip strength was 5/5. Fine and gross manipulation were well within normal limits. Claimant had full range of motion in the upper extremities, but had pain on examination.

On lower extremities examination, claimant had significant back pain with flexion and rotation. Ankle range of motion was normal.

Neurologically, claimant had no signs of nervousness, good personal hygiene, and ability to follow simple directions with a flat, somewhat depressed affect. His motor exam was within normal limits, except for his left lower extremity which showed 4+/5 strength to his tibialis anterior and gastrocs. He had no signs of atrophy. Sensation and reflexes were normal.

X-rays showed mild spondylosis at C3-C4 and C4-C5. Claimant had retention of disc space, and showed no changes in normal alignment of the spine.

Dr. Leddy opined that claimant's back pain appeared to be "somewhat out of proportion to his physical exam." (Tr. 144). He noted that the fact that claimant had significant pain with all range of motions in the lower extremities was "somewhat confusing." (Tr. 145). Except for the 4+/5 to his left lower extremity, claimant did not show any signs of any neurological deficits. He had no spasms or atrophy. Grip strength, dexterity, and grasping ability were normal.

**(6) Psychiatric Review Technique Form dated July 26, 2002**. Dr. Jeanne L. George assessed claimant for affective disorders. (Tr. 147). She determined that he had mild restriction of activities of daily living, difficulties in maintaining social functioning, and difficulties in maintaining concentration, persistence or pace. (Tr. 157). She noted that his activities of daily living were limited by pain only. (Tr. 159).

**(7) Report from Crowley Mental Health Center dated May 12, 2003**. Claimant was admitted on April 14, 2003, with complaints of severe depression, loss of energy, anhedonia, sleep and appetite disturbance, feelings of hopelessness and uselessness, excessive worry, impaired concentration, and suicidal ideation. (Tr. 161). He also reported chronic back pain and multiple situational stressors. He was discharged with a diagnosis of major depressive disorder, recurrent, severe. Chemotherapy and outpatient individual counseling were recommended. His

medications included Zoloft and Vistaril.

**(8) Records from University Medical Center ("UMC") dated April 14, 2003 to May 14, 2003**. Claimant was referred by Crowley Mental Health Center for suicidal and homicidal ideation. (Tr. 167, 171). His diagnosis was major depression with psychosis. (Tr. 167). His Global Assessment of Functioning ("GAF") score on admission was 30 and discharge was 60. (Tr. 183-A, 184).

**(9) Consultative Psychological Evaluation by Dr. Alfred Buxton dated September 24, 2003**. Claimant reported that his driver's license had been revoked secondary to his failure to pay child support. (Tr. 181). He complained of constant, severe neck and back pain, having two nervous breakdowns, poor sleep, frequent urinary urgency, poor energy and poor libido. He reported that he had been followed at the Crowley Mental Health Center one time per month for a year. His ability to cook and clean were significantly reduced secondary to his pain. He was able to shop, manage money, communicate, and manage time independently, but was dependent in his travel needs.

On examination, claimant ambulated with an obvious limp, and often changed postural position as if he were in pain and discomfort. He was bilingual, speaking Cajun French and English. Verbal receptive and expressive language skills were good. Dress and groom, social skill, and ability to attend and concentrate were good.

Recent and remote memories were intact. Pace was even.

Intellect appeared to be within normative limits. Judgment, reasoning, insight, and reflective cognition were good. Cognitions were clear and cogent. His mood was anxious with dysphoria. His affect had brief, open tearfulness. He had no evidence of hallucinatory or delusional phenomena, or homicidal or suicidal ideation.

Claimant's self-image was poor with low self-esteem. Goal orientation was positive. He complained of frequent headaches, dizziness, blurred vision, and shortness of breath.

Claimant was worrisome about his life situation. (Tr. 182). He was easily upset, and had frequent crying spells. He was alert, responsive, and oriented in all four spheres.

Dr. Buxton's impression was that claimant's intellect and adaptive daily living skills appeared to be within normal limits, although apparently there had been some compromise adaptively due to his chronic pain. He was regarded as being competent as a manager of his own personal affairs. Clinically, he presented with a major depressive disorder, recurrent, without psychotic features, with degree of impairment moderate and prognosis fair, and chronic pain, with degree of impairment moderately severe and prognosis guarded. His GAF score was 55 over the previous 12 months.

Dr. Buxton opined that "[w]ere [claimant] to secure gainful competitive employment he would not perform in a reliable and dependable fashion for a protracted period of time secondary to the negative impact of the aforementioned on his functioning." (Tr. 182). He stated that claimant would not deal well with the frustration and stress he would encounter in the job setting, and that he would have an exacerbation in overall symptomatology. He observed that claimant might be able to establish, but might have some difficulty maintaining, mutually rewarding relationships with co-workers and supervisors secondary to his depression and chronic pain. Dr. Buxton concluded that "[i]f, and when, he should demonstrate significant improvement in his overall functional status, as revealed through feedback from treating professionals and interventionists, then a referral to Louisiana Rehabilitation Service for assessment, training, and job placement would be appropriate."

**(10) Records from Pauline Faulk Center for Behavioral Health dated June 5-17, 2003**. Claimant was admitted for suicidal and homicidal ideations. (Tr. 206). (Tr. 234). He tested positive for barbiturates, benzodiazepines, and Methadone. (Tr. 205-06). His GAF score was 10-20. (Tr. 226). The diagnoses were adjustment disorder with depressed mood, polysubstance abuse, and potential prescription abuse. (Tr. 205). He was to be followed up at the Mental Health Clinic in Crowley and with

Dr. Paul Hubble for pain management. He was prescribed Wellbutrin.

**(11) Records from Dr. Paul Hubbell and Dr. Abadco dated July 10, 2002 to November 4, 2003**. On July 10, 2002, claimant reported severe pain in his mid and lower back with numbness in his arms and legs. (Tr. 268). He also reported urinary and fecal incontinence at times. On examination, he had a positive straight leg raise on the left reproducing pain in the back and leg, and back pain only on the right. Due to his new symptoms of numbness and incontinence, Dr. Hubbell ordered an MRI. He increased claimant's dosage of Oxycontin from every 12 hours to every 8 hours, and continued Trazodone, Zanaflex, and Aleve.

On July 17, 2003, Dr. Hubbell noted that claimant suffered with what appeared to be cauda equina syndrome and a disc bulge at L4-L5. (Tr. 264). He had severe pain in his lower back with radiation into his legs, weakness, incontinence of the bowel and bladder, and erection dysfunction. He was using Duragesic patches without side effects, but they were only relieving 50-60% of his pain. Dr. Hubbell recommended an MRI and continued use of the patches.

On September 23, 2003, claimant complained of headache, neck pain radiating down both arms, and low back pain radiating down both legs. (Tr. 282). He also reported insomnia, bladder incontinence, sexual dysfunction, and frequent falling from his legs giving out. (Tr. 283). His emotional and mental problems were pretty

stable with medications.  For pain, he was on the Duragesic patch, which provided relief for only two days.

On examination, claimant was 5 feet 8 inches tall and weighed 206 pounds. Dr. Abadco noted that he was overweight, but had lost a significant amount of weight since she last saw him.  He was  able to heel and toe walk without difficulty.  (Tr. 285).  Reflexes were 1-2+ bilaterally. He had decreased sensation through the upper extremities, more so on the left.  He also had decreased sensation on the left leg compared to the right.  He was oriented as to person, place, and time, and did not appear anxious or depressed.

Examination of the neck showed loss of lordosis.  Claimant had tenderness over the head and neck.  His neck appeared stable.  He had evidence of cervical paravertebral spasms.

On the spine, claimant had tenderness in the mid thoracic and lower back.  He had no scoliosis.  He had limited range of motion of the lumbar spine.  Claimant had no gross abnormalities of the upper extremities.  He had paravertebral spasms in the mid thoracic and lumbar areas.  He had full range of motion of the shoulder, arm, and wrist.  Motor strength was 5/5 with no atrophy.  (Tr. 286).

In the lower extremities, claimant had no gross abnormalities.  He had full range of hip and knee motion.  He had positive straight leg raising bilaterally, worse

on the right. He had no sign of atrophy and 5/5 motor strength.

Dr. Abadco's impression was cervical, lumbar, and thoracic spondylosis, insomnia secondary to chronic pain disorder, and lumbar and cervical disc disease. She noted that because of claimant's economic hardship, she was just prescribing medications to cope with his pain, which included the Duragesic patch and Lortab.

On November 4, 2003, claimant's pain score was 7/10 with about 30-40% pain relief. (Tr. 280). He had pain in his mid low back with arm numbness, headaches every other day, and sleeping problems. He was getting most of his medications for free, but could not afford diagnostic studies. He was taking Avinza for pain. Dr. Abadco increased Avinza to 180 mg/day with MSIR. She noted that claimant had increased the medication on his own, and that she had counseled him not to do that again. (Tr. 280-81).

**(12) MRI Results from LSU Medical Center dated January 8, 2004**. The lumbar MRI showed degenerative disc disease with a mild disc bulge at L4-5. (Tr. 272). There were no large focally herniated disc fragments.

**(13) Multiple Impairments Questionnaire dated February 9, 2004**. Dr. Abadco stated that she had treated claimant every three months since January 17, 2001. (Tr. 293). Her diagnosis was lumbar and cervical spondylosis. His prognosis was poor. (Tr. 294).

Dr. Abadco estimated claimant's level of pain and fatigue at 7 on a scale of 1-10. (Tr. 296). She stated that she was unable to completely relieve his pain. She reported that he was taking Avinza, MSIR, and Neurontin with no side effects. (Tr. 298).

Dr. Abadco checked off that claimant's symptoms were likely to increase if he were placed in a competitive work environment. (Tr. 299). She stated that claimant's condition interfered with his ability to keep his neck in a constant position. She further indicated that he could not do a full-time competitive job that required activity on a sustained basis. She checked that his pain, fatigue and other symptoms were frequently severe enough to interfere with attention and concentration. She noted that he was capable of low stress work.

Dr. Abadco checked that claimant would need to take one to two unscheduled breaks to rest during an 8-hour workday. (Tr. 300). She estimated that he would likely be absent more than three times a month. (Tr. 301). She noted that claimant needed a functional capacities evaluation regarding his work-related limitations.

**(14) Claimant's Administrative Hearing Testimony**. At the hearing on January 7, 2004, claimant was 40 years old. (Tr. 314). He testified that he was 5 feet 8 inches tall, and weighed 205 pounds. (Tr. 314-15). He stated that he had completed high school.

Claimant testified that he had last worked as a car salesman. (Tr. 316). He stated that he had quit after slipping at work and hurting his back. Prior to that, he had worked as a newspaper advertising salesman. (Tr. 317). He had also been employed as an instrumentation technician in the oil field, farmhand, and insurance salesman. (Tr. 317-18).

Claimant reported that he did not have a driver's license. (Tr. 319). He stated that he could not drive because of his medication and "my back and stuff."

Regarding activities, claimant testified that he sat in the chair and watched television for a few hours, then rested for a few hours. (Tr. 320). He stated that he needed help getting out of bed and getting dressed. He reported that he walked in the yard, talked on the phone, and watched television.

As to complaints, claimant testified that he had trouble sleeping because of low and mid back pain. (Tr. 321). He reported that the pain went into his leg, and that he had numbness in his hands and legs. (Tr. 321-22). He stated that he was having a hard time controlling his bladder. (Tr. 322). Additionally, he stated that he had been hospitalized twice for depression. (Tr. 323).

Claimant testified that medication relieved his pain to a certain degree. (Tr. 322). He stated that his medications caused him to shake and lose his memory. (Tr. 324-25). He said that surgery had been recommended. (Tr. 322). He reported that

he was seeing Dr. Abadco and going to the mental health clinic once a month. (Tr. 323). He said that he had been using a cane for about a year because he fell. (Tr. 325).

Regarding limitations, claimant reported that he could walk about 40 yards before having to rest. (Tr. 326). He stated that he could stand for about 1 minute. He said that he could sit for about 15 to 20 minutes.

Claimant reported that he had trouble reaching with his left arm because of numbness. He stated that he had trouble gripping or manipulating with his left hand. He said that he could not carry more than half a pound. (Tr. 237).

Additionally, claimant testified that he had problems with his memory and concentration. (Tr. 327). He reported that he had difficulty dealing with stress or pressure. He said that his pain was 10 on a scale of 1 to 10 without medications, and around a 6 with medications. (Tr. 329).

**(15) Administrative Hearing Testimony of Wendy Klamm, Vocational Expert ("VE")**. Ms. Klamm described claimant as a younger individual with a high school education and past work experience as an automobile salesperson, which was a light, skilled job; advertising sales representative, which was a light, skilled job; security system sales representative, which was a medium, skilled job; rice farm worker, which was a medium, skilled job; insurance sales agent, which is a light,

skilled job, and technical operator, which is a light, skilled job. (Tr. 335-36). The ALJ posed a hypothetical in which he asked Ms. Klamm to assume a claimant of the same age, education and vocational background; who was limited to light work; who was restricted to no more than occasional climbing, balancing, stooping, kneeling, crouching or crawling; who would experience moderate limitations on maintaining concentration and attention, persistence, and pace for extended periods, and who would be precluded from performing work with high stresses such as short deadlines or high production quotas. (Tr. 336). In response, the VE stated that he would not be able to perform his past work because it was stressful. (Tr. 337). However, she identified the jobs of cafeteria attendant, of which there were 1,360 jobs statewide and 105,050 nationally; press operator, of which there were 1,100 jobs statewide and 85,100 nationally, and garment folder, of which there were 9,760 jobs statewide and 358,200 nationally. (Tr. 337-38).

The ALJ posed another hypothetical in which he asked Ms. Klamm to assume a claimant with the same limitations who was limited to sedentary work. (Tr. 338). In response, the VE identified the jobs of food and beverage order taker, of which there were 2,800 jobs statewide and 142,600 nationally, and surveillance system monitor, of which there were 60 jobs statewide and 5,500 nationally. (Tr. 338-39). When the ALJ changed the restriction on maintaining concentration or attention,

persistence and pace to marked, Ms. Klamm stated that no work would be available. (Tr. 339). She further confirmed that if claimant's testimony regarding his pain, depression, and memory problems were fully true and credible, then there would be no jobs available.

**(16) The ALJ's Findings**. Claimant argues that: (1) the ALJ erred as a matter of law in failing to accord proper weight to the opinions of the treating and examining physicians, and (2) that the ALJ erred in assessing claimant's residual functional capacity, resulting in an improper reliance upon the testimony of the vocational expert given in response to a defective hypothetical question. Because I find that the ALJ failed to apply the proper analysis for rejecting the treating physician's opinion, I recommend that this matter be **REMANDED** for further proceedings.

As to the first argument, claimant asserts that the ALJ failed to properly consider the opinions of Dr. Buxton and Dr. Abadco that claimant was unable to perform sustained gainful activity due to the combination of his impairments. (rec. doc. 8, p. 5). The record reflects that the ALJ discounted the opinion of claimant's treating physician, Dr. Abadco, as to claimant's pain. He determined that Dr. Abadco's failure to provide any assessment for claimant's actual ability to perform the basic physical functions of work suggested "that the restrictions and limitations she reported are based on her assessment of the credibility of his subjective

complaints of pain, and not on objective medical findings." (Tr. 21).

It is well established that the opinion of a treating physician who is familiar with the claimant's impairments, treatments and responses, should be accorded great weight in determining disability. *Newton*, 209 F.3d at 455; *Leggett*, 67 F.3d at 566; *Greenspan*, 38 F.3d at 237. A treating physician's opinion on the nature and severity of a patient's impairment will be given controlling weight if it is "well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with ... other substantial evidence." *Newton,* 209 F.3d at 455 (citing 20 C.F.R. § 404.1527(d)(2)). Good cause for abandoning the treating physician rule includes disregarding statements by the treating physician that are brief and conclusory, not supported by medically accepted clinical laboratory diagnostic techniques, or otherwise unsupported by evidence. *Leggett*, 67 F.3d at 566; *Greenspan*, 38 F.3d at 237.

Here, the record reflects that Dr. Abadco consistently treated claimant for complaints of pain. (Tr. 129-40, 273-74, 280-91, 293-302). In the Multiple Impairments Questionnaire, she documented the positive clinical findings which supported her diagnosis of lumbar and cervical spondylosis, including an MRI showing minimal disc bulge with slight dessication at the L4-L5 level and a current perception threshold test demonstrating mild radiculopathy on the left side of L1 and

moderately radiculopathy at S1 on the right.[1]  (Tr. 122, 133, 135).  Based on these objective findings and claimant's complaints, Dr. Abadco opined that claimant could not do a full-time competitive job that required activity on a sustained basis.  (Tr. 299).  The ALJ has not cited substantial evidence for rejecting the treating physician's findings.

In *Loza v. Apfel*, 219 F.3d 378, 393 (5th Cir. 2000), the Fifth Circuit held that "[m]edical evidence must support a physician's diagnosis, but if it does "[t]he expert opinion[ ] of a treating physician as to the existence of a disability [is] binding on the fact-finder *unless contradicted by substantial evidence to the contrary*." (emphasis added).  *Id*. at 393 (citing *Bastien v. Califano,* 572 F.2d 908, 912 (2nd Cir. 1978) and 20 C.F.R. § 404.1527(d)(2)).  In this case, the ALJ cited no contradictory evidence for rejecting Dr. Abadco's opinion that claimant was could not perform work on a sustained basis.  The only medical evidence he cited was from Dr. Leddy, whom the ALJ acknowledged gave no assessment as to claimant's ability to perform the basic activities of work.  (Tr. 21, 143-45).

Additionally, the ALJ failed to perform the proper analysis in rejecting Dr. Abadco's opinion.  The Fifth Circuit has held that "absent reliable medical evidence

---

[1]Dr. Abadco also identified the results of a cervical discogram from 1996 and a cervical MRI dated 1995 which are not in the record.  (Tr. 294).

from a treating or examining physician controverting the claimant's treating specialist, an ALJ may reject the opinion of the treating physician *only* if the ALJ performs a detailed analysis of the treating physician's views under the criteria set forth in 20 C.F.R. § 404.1527(d)(2)." (emphasis in original). *Newton v. Apfel*, 209 F.3d 448, 453 (5th Cir. 2000). In *Myers v. Apfel*, 238 F.3d 617, 620 (5th Cir. 2001), the court held that an ALJ must consider the following factors before declining to give any weight to the opinions of a treating doctor: length of treatment, frequency of examination, nature and extent of relationship, support provided by other evidence, consistency of opinion with record, and specialization. *Id.* at 621 (citing *Newton,* 209 F.3d at 456). The ALJ did not consider those factors in this case, which constitutes error.

Accordingly, the undersigned recommends that this case be **REMANDED** to the Commissioner for further administrative action pursuant to the fourth sentence of 42 U.S.C. § 405(g). This includes, but does not limit, sending the case to the hearing level with instructions to the Administrative Law Judge to do a proper analysis for rejecting the treating pain specialist's opinion under *Newton v. Apfel*, 209 F.3d 448, 453 (5th Cir. 2000) and *Myers v. Apfel*, 238 F.3d 617, 620 (5th Cir. 2001).

Inasmuch as the remand recommended herein falls under sentence four of Section 405(g), any judgment entered in connection herewith will be a "final

judgment" for purposes of the Equal Access to Justice Act (EAJA). *See, Richard v. Sullivan*, 955 F.2d 354 (5th Cir. 1992) and *Shalala v. Schaefer*, 509 U.S. 292 (1993).

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and F.R.Civ.Proc. 72(b), parties aggrieved by this recommendation have ten (10) business days from service of this Report and Recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within ten (10) days after being served with a copy thereof. Counsel are directed to furnish a courtesy copy of any objections or responses to the District Judge at the time of filing.

**FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FACTUAL FINDINGS AND/OR THE PROPOSED LEGAL CONCLUSIONS REFLECTED IN THIS REPORT AND RECOMMENDATION WITHIN TEN (10) DAYS FOLLOWING THE DATE OF ITS SERVICE, OR WITHIN THE TIME FRAME AUTHORIZED BY FED.R.CIV.P. 6(b), SHALL BAR AN AGGRIEVED PARTY FROM ATTACKING THE FACTUAL FINDINGS OR THE LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT COURT, EXCEPT UPON GROUNDS OF PLAIN ERROR. *DOUGLASS V. UNITED***

***SERVICES AUTOMOBILE ASSOCIATION*, 79 F.3D 1415 (5TH CIR. 1996).**

Signed this 18th day of April, 2006, at Lafayette, Louisiana.

_____
C. MICHAEL HILL
UNITED STATES MAGISTRATE JUDGE